# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| LEANNE M. SANNER, | ) | |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-143 |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

McLAUGHLIN, SEAN J., J.

### I. INTRODUCTION

Leanne M. Sanner ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401 – 433, 1381 – 1383f ("Act"). This matter comes before the court on cross motions for summary judgment. (ECF Nos. 11, 13). The record has been developed at the administrative level. For the following reasons, Plaintiff's Motion for Summary Judgment is DENIED, and Defendant's Motion for Summary Judgment is GRANTED.

### II. PROCEDURAL HISTORY

Plaintiff filed for DIB and SSI with the Social Security Administration February 13, 2008 and February 25, 2008, respectively, claiming an inability to work beginning October 16, 2007

due to limitations stemming from various physical and mental impairments. (R. at 106 – 113)[1]. Plaintiff was initially denied benefits on July 17, 2008. (R. at 51 – 60). A hearing was scheduled for November 4, 2009, and Plaintiff appeared to testify represented by counsel. (R. at 25 – 47). A vocational expert also testified. (R. at 25 – 47). The Administrative Law Judge ("ALJ") issued his decision denying benefits to Plaintiff on December 8, 2009. (R. at 9 – 24). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which request was denied on April 30, 2010, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 3).

Plaintiff filed her Complaint in this court on June 9, 2010. (ECF No. 2). Defendant filed his Answer on April 15, 2011. (ECF No. 7). Cross motions for summary judgment followed.

### III. LEGAL STANDARD

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F.2d 581, 583 (3d Cir. 1986). When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt.

---

[1] Citations to ECF Nos. 8 – 8-7, the Record, *hereinafter*, "R. at __."

404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy. 20 C.F.R. §404.1520(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[2], 1383(c)(3)[3]; *Schaudeck v. Comm'r Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F.3d 113, 118 (3d Cir. 2002).

---

[2] Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[3] Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3d Cir. 1986).

### IV. EVIDENTIARY RECORD[4]

#### A. General Background

Plaintiff claimed disability due to alleged fibromyalgia, degenerative disc disease, migraine headaches, depression, fatigue, and a number of more general averments of pain and limitation. (R. at 129). Plaintiff claimed that she was precluded from all forms of work. At the time of her administrative hearing, Plaintiff was forty five years of age. (R. at 29). She was born on December 22, 1963. (R. at 29). Plaintiff lived with her sister-in-law and niece. (R. at 38).

---

[4] As Plaintiff's arguments in her Motion for Summary Judgment pertain solely to the ALJ's conclusions regarding her mental impairments, the court will discuss the record only insofar as it is relevant to Plaintiff's mental status. (ECF No. 12 at 6 – 19).

She had two adult children, and was twice divorced. (R. at 29, 242). Plaintiff graduated from high school, and completed a course of computer training at the Tri-State Business Institute in Erie, Pennsylvania. (R. at 242). She had last worked for almost ten years, ending in October 2007, as a district judge's secretary. (R. at 130). Prior to that time, she had worked as a bank teller and as an accountant's secretary. (R. at 130). She now subsisted on cash assistance and food stamps. (R. at 29). Plaintiff also received medical benefits through the state. (R. at 29).

In her own report of day-to-day functioning, Plaintiff explained that she typically rose early in the morning, made coffee, checked emails, showered, and changed, in order to take care of whatever tasks may have needed attention during the day. (R. at 153 – 63, 172 – 79). She allegedly only slept three or four hours per night. (R. at 153 – 63, 172 – 79). She took rests in bed during the day, but did not sleep. (R. at 153 – 63, 172 – 79). She cared for pets. (R. at 153 – 63, 172 – 79). At times, dizziness and pain in the hands and arms allegedly made personal care difficult. (R. at 153 – 63, 172 – 79). She prepared a simple meal once a day. (R. at 153 – 63, 172 – 79). She was capable of doing her own laundry and washing dishes. (R. at 153 – 63, 172 – 79). Plaintiff could drive a car, but preferred to go out no more than once or twice a week. (R. at 153 – 63, 172 – 79). She went shopping for necessary items every few weeks. (R. at 153 – 63, 172 – 79). Plaintiff was capable of handling bills and checking/ savings accounts, and could count change. (R. at 153 – 63, 172 – 79).

Plaintiff's interests included watching television, listening to music, and occasionally reading. (R. at 153 – 63, 172 – 79). She visited her mother and sister-in-law once or twice per week. (R. at 153 – 63, 172 – 79). Otherwise, Plaintiff did not wish to engage in social activities. (R. at 153 – 63, 172 – 79). Plaintiff stated that she had no issues following written instructions, but needed to write down spoken instructions. (R. at 153 – 63, 172 – 79). Plaintiff had never

5

been terminated from a job due to an inability to get along with others. (R. at 153 – 63, 172 – 79). However, she asserted that she did not handle stress and changes in routine well. (R. at 153 – 63, 172 – 79). Her depression left her unmotivated. (R. at 153 – 63, 172 – 79).

### B. Medical History

Over the course of the record, Plaintiff was regularly treated by physician William Getson, M.D. for a variety of physical and mental conditions. On April 5, 2007, August 6, 2007, and January 18, 2008, Plaintiff visited Dr. Getson for complaints regarding physical problems she was experiencing. (R. at 204 – 15). With respect to Plaintiff's psychological condition, at those times, Plaintiff's "active problems" included depression; upon examination, however, Plaintiff was never depressed. (R. at 201 – 03). On several occasions, she also was not found to be suffering from insomnia.

On March 3, 2008, Plaintiff visited Dr. Getson for complaints of depression. (R. at 201 – 03). Plaintiff claimed that her depression medication was not working, she was feeling down, and she was having crying spells. (R. at 201 – 03). She made claims of high stress in her life due to situational issues. (R. at 201 – 03). Plaintiff did admit that she probably should see a counselor. (R. at 201 – 03). Dr. Getson noted that Plaintiff was not suicidal, she was alert and oriented, her cognitive functioning was normal, her speech was normal, her attitude exhibited no abnormality, her affect was not blunted, her thought processes were unimpaired, and her thought content was unimpaired. (R. at 201 – 03). However, she was unhappy and tearful. (R. at 201 – 03). Plaintiff's prescription medication dosage was increased, and she was recommended for counseling. (R. at 201 – 03).

The record indicates that, beginning in March 2008, Plaintiff began to seek treatment for her mental condition at Safe Harbor Behavioral Health ("Safe Harbor") in Erie, Pennsylvania.

(R. at 256, 322). Out of twenty-one scheduled visits for counseling following that time, Plaintiff attended only ten. (R. at 256, 322). Plaintiff first appeared at Safe Harbor on March 27, 2008. (R. at 323 – 26). Plaintiff was found to be depressed following the sudden break-up of a long-term relationship. (R. at 323 – 26). Plaintiff described losing weight, sleeping poorly, isolating herself, and feeling fatigued. (R. at 323 – 26). Plaintiff explained that on March 18, 2008, she admitted herself to a crisis center for alleged suicidal ideation and a superficial attempt evidenced by minor cuts to both wrists, but not requiring medical attention. (R. at 323 – 26).

Plaintiff reported a history of aggressive behavior towards others. (R. at 323 – 26). She also alleged loss of concentration and attention. (R. at 323 – 26). Plaintiff had a good relationship with her children, sister, sister-in-law, and mother. (R. at 323 – 26). It was noted that Plaintiff had recently applied for disability benefits. (R. at 323 – 26). Plaintiff was observed to be alert, oriented, and cooperative. (R. at 323 – 26). She had fair insight and judgment, average intellect, appropriate, but sad affect, organized thoughts, soft, spontaneous speech, adequate eye contact, and feelings of hopelessness, helplessness, and worthlessness. (R. at 323 – 26). Plaintiff was given a global assessment of functioning[5] ("GAF") score of 50. (R. at 323 – 26).

---

[5] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 91 – 100 exhibits "[s]uperior functioning in a wide range of activities" and "no symptoms;" of 81 – 90 exhibits few, if any, symptoms and "good functioning in all areas," is "interested and involved in a wide range of activities," is "socially effective," is "generally satisfied with life," and experiences no more than "everyday problems or concerns;" of 71 – 80, may exhibit "transient and expectable reactions to psychosocial stressors" and "no more than slight impairment in social, occupational, or school functioning;" of 61 – 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning, but generally functioning pretty well" and "has some meaningful interpersonal relationships;" of 51 – 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41 – 50 may have "[s]erious symptoms (e.g., suicidal ideation …)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 31 – 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood;" of 21 – 30 may be "considerably influenced by delusions or hallucinations" or "serious impairment in

7

On April 14, 2008, Plaintiff partook in a clinical psychological disability evaluation completed by Michael Mercatoris, Ph.D. on behalf of the Bureau of Disability Determination. (R. at 238 – 47). Plaintiff attended the evaluation independently, driving approximately twenty-five miles to the evaluation site. (R. at 238 – 47). She was on-time, pleasant, and was neatly and casually dressed. (R. at 238 – 47). During the evaluation, Dr. Mercatoris observed that her eye contact was variable, but her behavior and mannerisms were normal. (R. at 238 – 47). Plaintiff's speech was also normal. (R. at 238 – 47).

Dr. Mercatoris noted Plaintiff's complaints of fibromyalgia, degenerative disc disease, and migraine headaches, accompanied by depression. (R. at 238 – 47). Plaintiff explained that she had been diagnosed with depression three years before the evaluation. (R. at 238 – 47). She had not previously visited a psychiatrist, however, and was to have her first appointment with one on May 28, 2008. (R. at 238 – 47). Plaintiff did indicate that she had recently started counseling on March 21, 2008 due to claimed suicidal ideation and slight cutting of her wrist. (R. at 238 – 47). She was taking a number of prescription medications. (R. at 238 – 47).

When questioned about how she felt, Plaintiff informed Dr. Mercatoris that she had been depressed for a long time, and had been coping with feelings of helplessness, hopelessness, and worthlessness. (R. at 238 – 47). She had feelings of guilt, and had difficulty sleeping. (R. at 238 – 47). Her appetite was poor, and she had lost a significant amount of weight. (R. at 238 – 47). She expressed recent suicidal ideation and a superficial attempt at cutting her wrists. (R. at 238 – 47). While she got along well with her sons, Plaintiff had removed herself from her former social activities. (R. at 238 – 47). She had no issues with the public, co-workers, or

---

communication or judgment (e.g., … suicidal preoccupation)" or "inability to function in almost all areas;" of 11 – 20 may have "[s]ome danger of hurting self or others" or "occasionally fails to maintain minimal personal hygiene" or "gross impairment in communication;" of 1 – 10 may have "[p]ersistent danger of severely hurting self or others" or "persistent inability to maintain minimal personal hygiene" or "serious suicidal act with clear expectation of death." *Id.*

bosses at her former places of employment. (R. at 238 – 47). Plaintiff believed she could have continued to work as a secretary if she did not suffer the ill-effects of fibromyalgia, degenerative disc disease, and depression. (R. at 238 – 47). Plaintiff was noted to be reasonably reliable. (R. at 238 – 47).

Dr. Mercatoris described Plaintiff's expression as dysphoric, but she had a full range of affect, appropriate to her mood. (R. at 238 – 47). Her verbal production was full and goal-oriented, there was no loosening of associations, there was no obsessive or compulsive behavior, she generally denied suicidal ideation, abstract thinking was clear, she could perform simple addition and subtraction, and her memory was intact. He found her social judgment was impaired by her depression, and expressed doubts about her ability to maintain a proper rapport with potential future co-workers and supervisors, as well as the general public. (R. at 238 – 47). Dr. Mercatoris believed Plaintiff exhibited characteristics of major depression of a fairly chronic nature. (R. at 238 – 47). A recent break-up with a long-time paramour was noted to have worsened Plaintiff's outlook. (R. at 238 – 47).

Dr. Mercatoris opined that Plaintiff would be able to adapt to simple changes in a work situation, but would be slow to react to deadlines and schedules, and would not likely be able to maintain regular attendance due to her social withdrawal. (R. at 238 – 47). Further, Dr. Mercatoris concluded that Plaintiff would be markedly limited in interacting appropriately with the public and supervisors. (R. at 238 – 47). She was moderately limited in all other aspects of functioning. (R. at 238 – 47).

A psychiatric evaluation from Safe Harbor on May 28, 2008, indicated that three years prior, Plaintiff suffered a number of personal losses, including the death of several family members and the break-up of a long-term relationship, that created episodic suicidal ideation,

crying spells, insomnia, loss of appetite, and general anhedonia. (R. at 157 – 58). Plaintiff claimed that she left her last job in October 2007 as a result of fibromyalgia and an inability to concentrate. (R. at 157 – 58). A mental status examination revealed that Plaintiff was alert and oriented, had organized thoughts, was not suicidal, and was without hallucination or delusion. (R. at 157 – 58). She was tearful and appeared significantly depressed. (R. at 157 – 58). Plaintiff endorsed feelings of helplessness and hopelessness. (R. at 157 – 58). It was felt that Plaintiff's psychiatric medications were ineffective, and her prescription was to be changed. (R. at 157 – 58). Plaintiff was diagnosed with severe, recurrent major depression. Her GAF score was 49. (R. at 157 – 58). Her highest such score over the previous year was thought to have been 55. (R. at 157 – 58).

On July 16, 2008, state agency evaluator John Vigna completed a mental residual functional capacity ("RFC") assessment of Plaintiff. (R. at 264 – 67). In it, he diagnosed Plaintiff with affective disorders. (R. at 264 – 67). He found that Plaintiff was moderately to not significantly limited in all areas of functioning. (R. at 264 – 67). He based his conclusions on a review of the medical record, stating that Plaintiff was only partially credible, that Dr. Mercatoris over-estimated Plaintiff's degree of functional limitation, and that objective medical findings indicated that Plaintiff had intact memory, could perform simple, routine, repetitive tasks in a stable environment, could carry out short, simple instructions, and could perform production-oriented jobs requiring little independent decision-making. (R. at 264 – 67). While stress and social interactions limited Plaintiff, Mr. Vigna believed that Plaintiff was still capable of full-time work. (R. at 264 – 67).

Plaintiff was not seen again at Safe Harbor until August 15, 2008. (R. at 331 – 32). At that time she was described as mildly depressed, but smiling at intervals during her visit. (R. at

331 – 32). Plaintiff denied suicidal ideation, and denied that prior self-inflicted cuts to her wrists were an attempt at suicide. (R. at 331 – 32). Plaintiff explained that she was attempting to release the pain caused by the termination of her former relationship. (R. at 331 – 32). Safe Harbor staff noted only marginal improvement with her medications. (R. at 331 – 32). Plaintiff was to start individual therapy. (R. at 331 – 32). Her GAF score was 55. (R. at 331 – 32).

By November 14, 2008, Plaintiff reported that her prescription medications had significantly improved her mental state. (R. at 330). Her energy and motivation had both increased. (R. at 330). She was only mildly depressed, was organized and appropriate, and denied suicidal ideation. (R. at 330). Plaintiff reported that she was coping well, and had the support of her family. (R. at 330). She had not been to individual therapy, as recommended. (R. at 330). She was still considered to be suffering from severe recurrent major depression, and was given a GAF score of 49. (R. at 330).

Plaintiff was admitted to Saint Vincent Health Center ("Saint Vincent") in Erie, Pennsylvania, on February 1, 2009 due to complaints of chest pain. (R. at 281 – 321). She was ultimately diagnosed with atypical chest pain attributed to high stress and anxiety. (R. at 281 – 321). Plaintiff was released the following day in stable condition. (R. at 281 – 321).

Plaintiff appeared at Safe Harbor on March 18, 2009. (R. at 333 – 34). Plaintiff's admission to Saint Vincent was noted, as was the conclusion that a panic attack had caused Plaintiff's chest pain. (R. at 333 – 34). Plaintiff was still believed to suffer severe recurrent major depression, and was given a GAF score of 49. (R. at 333 – 34). However, her sleep was determined to be adequate, Plaintiff was observed to be cooperative, calm, attentive, and only mildly depressed. (R. at 333 – 34). She denied suicidal ideation. (R. at 333 – 34). She had still

11

not attended individual therapy and had significant, unresolved issues from her last relationship. (R. at 333 – 34).

At a session at Safe Harbor on June 9, 2009, Plaintiff reported increased stress in her life as a result of a failed attempt at a new relationship. (R. at 335 – 36). However, Plaintiff was noted to be attentive, alert, organized, and cooperative. (R. at 335 – 36). She was also dismissive and pessimistic, but exhibited only mild anxiety and depression. (R. at 335 – 36). She denied suicidal ideation. (R. at 335 – 36). Plaintiff had still not engaged in individual therapy. (R. at 335 – 36). Plaintiff was again diagnosed with severe recurrent major depression, and was given a GAF score of 49. (R. at 335 – 36).

Plaintiff's final treatment at Safe Harbor on the record was on October 5, 2009. (R. at 337 – 38). Plaintiff reported depression mostly related to pain stemming from her fibromyalgia. (R. at 337 – 38). Plaintiff was tearful and unmotivated, and hoped to receive disability benefits. (R. at 337 – 38). Plaintiff was described as alert, attentive, depressed, and monotone. (R. at 337 – 38). She denied suicidal ideation. (R. at 337 – 38). Plaintiff had still not engaged in individual therapy, despite continuing recommendations to do so. (R. at 337 – 38). Plaintiff was diagnosed with severe recurrent major depression, and was given a GAF score of 49. (R. at 337 – 38). Plaintiff was indicated to be overly-fixated upon receiving disability benefits as opposed to resolving her mental issues. (R. at 337 – 38).

### C. Administrative Hearing

Plaintiff testified that she began treatment for her depression five years prior to her hearing, and that she had been seeking treatment consistently during that time. (R. at 31 – 32). Plaintiff regularly received medication from a psychiatrist, and was always compliant with her medication regimen. (R. at 32). Allegedly, the medications were only helpful, "sometimes." (R.

at 32). She claimed that she had also regularly visited a therapist, but that she ceased individual therapy due to issues with money. (R. at 32).

Despite her mental health treatment, Plaintiff stated that she experienced depression and anxiety, panic attacks, and crying spells. (R. at 36 – 37). She isolated herself from social situations. (R. at 37). She typically only socialized with her sister-in-law, niece, children, and a long-time friend. (R. at 38). Plaintiff was capable of going to movies and restaurants with these family members. (R. at 38 – 39).

Plaintiff was able to grocery shop when necessary. (R. at 38). Plaintiff maintained her driver's license and was capable of driving independently. (R. at 31). She also testified that she was able to care for her personal needs, but sometimes required help with chores. (R. at 37).

Following Plaintiff's testimony, the ALJ asked the vocational expert whether a hypothetical person of Plaintiff's age, educational background, and work experience would be capable of engaging in a significant number of jobs in existence in the national economy if only capable of light work, and further limited to jobs involving only simple, repetitive tasks in a routine work environment not involving high stress, quotas, close attention to quality production standards, heights, climbing, or operation of dangerous machinery. (R. at 44).

The vocational expert replied that such a person would be capable of working as a "folder," with 100,000 positions available in the national economy, as a "remnant sorter," with 75,000 positions available, and as a "cashier," with 1.7 million positions available. (R. at 45). The ALJ subsequently asked the ALJ whether the hypothetical person would still be capable of finding work if limited to only sedentary work requiring a sit/stand option. (R. at 45).

The vocational expert responded that such a person would be capable of working as a "surveillance system monitor," with 350,000 positions available, as a "call-out operator," with

600,000 positions available, and as an "information clerk," with 288,000 positions available. (R. at 45). However, the hypothetical person could be absent from work no more than one-and-one-half days per month, and could be off-task for no more than ten percent of any given workday. (R. at 46).

V. DISCUSSION

In his decision, the ALJ concluded that Plaintiff suffered medically determinable severe impairments in the way of fibromyalgia and depressive disorder. (R. at 14). The ALJ further concluded that Plaintiff was capable of light work, and her impairments limited her to jobs involving only simple, repetitive tasks using routine work processes in routine work settings not involving high stress, high quotas, close attention to quality production standards, working at heights, climbing, or the operation of dangerous machinery. (R. at 16). Based upon the testimony of the vocational expert, the ALJ determined that despite the aforementioned limitations, Plaintiff would still qualify for a significant number of jobs in existence in the national economy. (R. at 19 – 21). Plaintiff was not, therefore, entitled to benefits. (R. at 19 – 21).

Plaintiff objects to the determination of the ALJ, arguing that he failed to adequately explain the basis for his rejection of one aspect of Dr. Mercatoris' findings. (ECF No. 12 at 11 – 13). Plaintiff further argues that the ALJ erred in failing to discuss her GAF scores. (ECF No. 12 at 13 – 16). Finally, Plaintiff contends that the ALJ's hypothetical to the vocational expert and the ultimate RFC assessment were allegedly flawed due to the failure to properly incorporate all of Plaintiff's credibly established limitations. (ECF No. 12 at 17 – 19). The court notes that when rendering a decision, an ALJ must provide sufficient explanation of his or her final determination to provide a reviewing court with the benefit of the factual basis underlying the

14

ultimate disability finding. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *S.E.C. v. Chenery Corp.*, 318 U.S. 80, 94 (1943)). The ALJ need only discuss the most pertinent, relevant evidence bearing upon a claimant's disability status, but must provide sufficient discussion to allow the court to determine whether any rejection of potentially pertinent, relevant evidence was proper. *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 203 – 04 (3d Cir. 2008) (citing *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000); *Cotter*, 642 F.2d at 706). In the present case, the ALJ met his responsibilities under the law.

Dr. Mercatoris opined, *inter alia*, that Plaintiff had marked restrictions relative to her ability to interact appropriately with the public and supervisors. (R. at 238 – 47). In his decision, the ALJ stated the following concerning Dr. Mercatoris:

> Psychological consultative examiner Dr. Mercatoris determine that claimant is only moderately impaired in the ability to understand, remember, and carry out instructions, but found her to have marked restrictions in the ability to interact with the public and supervisors. He also opined that claimant would not be able to maintain regular attendance due to her tendency to withdraw from society when under stress. (Ex 3F/2, 3, 10)[.] Dr. Mercatoris' findings regarding claimant's social functioning are given little weight as they are not supported by the evidence of record which reveals that claimant has friends, and engages in social activities with friends and family. Moreover, Dr. Mercatoris' conclusions regarding claimant's social functioning are not supported by his treatment notes, which do not reveal that claimant has severe limitations in this area. Dr. Mercatoris reports that claimant was able to drive 25 miles unaccompanied to the psychological evaluation. Claimant reported that she gets along well with her sons, was able to get along well with supervisors, co[-]workers, and the public in the past, and he found no deficits in claimant's social maturity. Dr. Mercatoris' findings concerning claimant's ability to understand, remember, and carry out instructions are given great weight as they are supported by his treatment records and the evidence of record. (Ex 3F/10)[.]

(R. at 19 – 20). The Safe Harbor treatment records do not reference any social functioning limitations. (R. at 257 – 58; 323 – 26; 333; 335 – 36). Moreover, the State Agency mental health expert, Dr. Vigna, concluded that Plaintiff's limitations in dealing with the public would not preclude her from performing competitive work on a sustained basis. (R. at 264 – 67). Dr.

Vigna also declined to give great weight to the opinion of Dr. Mercatoris because he concluded that it exaggerated the actual severity of the Plaintiff's social functioning limitations. (R. at 264 – 67). In sum, the ALJ's explanation of his rejection of Dr. Mercatoris' opinion was consistent with the standard set forth above and substantially supported by the record.

With respect to Plaintiff's claim regarding the treatment of her GAF scores, the Court of Appeals for the Third Circuit has held that a "GAF score does not have a direct correlation to the severity requirements of the Social Security mental disorder listings." *Gilroy v. Astrue,* 351 Fed. App'x 714, 715 – 16 (3d Cir. 2009) (citing 66 Fed. Reg. 50764-5 (2000)). Lower courts in this circuit have further recognized that while GAF scores can indicate an individual's capacity to work, they also correspond to unrelated factors, and absent evidence that a GAF score was meant to indicate an impairment of the ability to work, a GAF score does not establish disability. *Coy v. Astrue*, 2009 WL 2043491 at *14 (W.D. Pa. 2009) (quoting *Chanbunmy v. Astrue*, 560 F. Supp. 2d 371, 383 (E.D. Pa. 2008)) ("A GAF score, without evidence that it impaired the ability to work, does not establish an impairment."). *See also Gilroy,* 351 Fed. App'x at 716 (the ALJ was not found to have erred when omitting a GAF score where the medical source in question did not make specific limitations findings or otherwise explain the basis for the GAF score, and the ALJ discussed the medical source's reports).

Here, Plaintiff's medical source statements failed to provide specific limitations findings to explain the GAF scores given, or to tie the GAF scores into some explanation of Plaintiff's ability to work. The ALJ cannot, under such circumstances, be expected to provide a specific assessment of the GAF scores. *See Gilroy*, 351 Fed. App'x at 716. Given the ALJ's otherwise thorough discussion of Plaintiff's medical history and the notes wherein the GAF scores were provided, the court finds that the ALJ's discussion did not constitute error requiring remand. *See*

*Coy*, 2009 WL 2043491 at *14 ("The failure to mention the scores specifically does not constitute reversible error. The Court declines plaintiff's invitation to remand solely so the ALJ can insert the GAF scores into his decision.").

Lastly, in light of the above discussion, I conclude that the hypothetical posed to the vocational expert which omitted any limitations with respect to the Plaintiff's ability to interact with the public and supervisors was supported by substantial evidence.

## VI. CONCLUSION

Based upon the foregoing, the ALJ adequately supported his conclusions with substantial evidence from the record. Accordingly, Plaintiff's Motion for Summary Judgment will be denied, Defendant's Motion for Summary Judgment will be granted, and the opinion of the ALJ will be affirmed. An appropriate Order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEANNE M. SANNER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 10-143 |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

AND NOW, this 24th day of February, 2012, for the reasons stated in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [ECF No. 11] is DENIED, Defendant's Motion for Summary Judgment [ECF No. 13] is GRANTED, and the decision of the ALJ is AFFIRMED, pursuant to the fourth sentence of 42 U.S.C. § 405(g). JUDGMENT is hereby entered in favor of Defendant, Commissioner of Social Security, pursuant to Rule 58 of the Federal Rules of Civil Procedure, and against Plaintiff, Leanne M. Sanner.

The clerk is hereby directed to mark the case closed.

s/ Sean J. McLaughlin
United States District Judge

cm: All parties of record.